IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RANDY SHREY and JANETE        :        Case No. 4:10-CV-1420
SHREY,                        :
                  Plaintiffs  :        (Judge Brann)
                              :
        v.                    :
                              :
RAYMOND KONTZ III,            :
                              :
              Defendant.      :

**MEMORANDUM**

November 7, 2013

## I. BACKGROUND

Plaintiffs, Randy and Janete Shrey ( hereinafter "the Shreys"), initiated this

civil action on July 8, 2010, by filing a six-count complaint against Defendant

Raymond Kontz III. The action was initiated after Kontz, a City of Williamsport

police officer, seized more than 600 collectible Little League, International,

trading pins from Plaintiffs in their home. The complaint alleged Unlawful Seizure

of Property pursuant to 42 U.S.C. §1983 (Count I), violation of Procedural Due

Process pursuant to 42 U.S.C. §1983 (Count II), violation of Substantive Due

Process pursuant to 42 U.S.C. §1983 (Count III), Invasion of Privacy (Count IV),

Conversion (Count V) and an action for Replevin (Count VI). ECF No. 1.

This action had previously been assigned to the Honorable William W.

1

Caldwell.  Judge Caldwell dismissed Counts II and III of the complaint pursuant to a summary judgment motion filed by Defendant, and indicated that Plaintiffs were voluntarily withdrawing Count IV.  ECF No. 50.  Upon motion from Plaintiffs, this action was reassigned to the undersigned on February 14, 2013.

The summary of the *sui generis* complaint and trial regarding the illegal seizure and conversion of trading pins is as follows.  A telephone call purportedly received from an unknown and un-named individual at Little League, International[1] (hereinafter "Little League"), prompted an investigation by Kontz, at the time a police captain with the Williamsport Police Department, into the sale of trading pins bearing the logo of both Little League, International and the Williamsport Police Department on the website, www.ebay.com.  The testimony of Kontz was that the complaint from Jim Ferguson, Chief of Security at Little League, was regarding the use of the Little League logo.  ECF No. 116 at 148-149. Kontz subsequently investigated and contacted www.ebay.com, which identified Randy Shrey, one of the Plaintiffs, as the seller.

Kontz and Agent Steven J. Sorage, at the time of the events in question, a

---

[1]Plaintiffs do not believe a call was placed by someone at Little League, they assert, and there is some testimony to back this up, that someone at the Williamsport Police Department placed the call to Little League.  It is of no relevance to the disposition of the instant motion whether or not the call did or did not take place or who called whom.

police officer with the Williamsport Police Department, called Kenneth Osokow, Esquire, a long-time Lycoming County Assistant District Attorney to determine if there was probable cause.[2] ECF No. 116 at 155-166. On July 14, 2008, Captain Kontz, and Sorage, went to the home of Randy and Janete Shrey. Captain Kontz told the Shreys that selling pins with the Williamsport Police Department logo was illegal, but that the investigation would be terminated if they promptly turned the pins over to the Williamsport Police Department. The Shreys responded by turning over hundreds of pins that contained the Williamsport Police Department logo.

Kontz did not create an incident report to document his encounter nor did he prepare a receipt to give the Shreys for their confiscated pins. ECF No. 116 at 183-184. Kontz was later disciplined by the Williamsport Police Department for his failure to prepare appropriate documentation. *Id.*

A three-day jury trial was held May 29, 30 and 31, 2013. An eight-member jury returned a unanimous verdict in favor of the Plaintiffs and against Defendants on all counts. The jury determined that the facts did not support a qualified immunity defense. ECF No. 101, Questions 1 and 2. The jury found for the Shreys on their 42 U.S.C. § 1983 claim, in determining that Kontz unlawfully

---

[2]It is not clear from the testimony if Kontz was asking Osokow if there was probable cause to arrest, seize property or both.

seized the property of the Shreys in violation of the *Fourth Amendment* to the United Status Constitution. ECF No. 101, Question 3. The jury also determined that Kontz converted the Shreys property in violation of Pennsylvania law. ECF No. 101, Question 4. The jury awarded Randy and Janete Shrey $14,553.09 in compensatory damages and $45,000 in punitive damages. ECF No. 101, Questions 5 and 6.

The Defendant orally moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) both during and at the close of the trial. The undersigned deferred ruling on the motion. On June 16, 2013, Defendant filed a renewed motion for a judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), together with a motion for a new trial pursuant to Fed. R. Civ. P. 59 and/or for remititur. ECF No. 113. The matter has been fully briefed and is now ripe for disposition.

For the reasons that follow, the undersigned will deny Defendant's motion in its entirety.

## II. DISCUSSION

As an initial matter, before addressing the merits of the motion, the undersigned believes it important to stress that Kontz did not lose this case due to poor advocacy on the part of his counsel. To the contrary, David MacMain, Esquire provided the Court with well researched and well argued briefs (with the

exception of the instant motion and accompanying briefs) and proposed points for charge; he conducted sharp cross-examination; he was a pleasure to work with professionally. Kontz did not lose this case due to any error by his counsel. Kontz lost the case solely on the facts found by the jury.

## 1. Motion for Judgment as a Matter of Law

A court may grant a motion for judgment as a matter of law against a party when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [moving] party on that issue." Fed. R. Civ. P. 50(a). After trial, a party may renew their motion pursuant to Fed. R. Civ. P. 50(b).

Whether made under Rule 50(a) or 50(b), a motion for judgment as a matter of law should be granted only if, viewing the evidence in the light most favorable to the non-movant, and giving the non-movant the advantage of every reasonable and fair inference, there is insufficient evidence from which a jury reasonably could find against the movant. The movant is entitled to judgment if there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law. *Beck v. City of Pittsburgh*, 89 F.3d 966, 970-971 (3d Cir. 1996), *cert. denied*, 519 U.S. 1151, 117 S. Ct. 1086, 137 L. Ed. 2d 219 (1997); *McDaniels v. Flick*, 59 F.3d 446, 453 (3d Cir. 1995),

cert. denied, 516 U.S. 1146, 134 L. Ed. 2d 97, 116 S. Ct. 1017 (1996).

> Such a motion should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party.

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) (internal citations and quotations omitted). *See also Failla v. City of Passaic*, 146 F.3d 149, 153 (3d Cir. 1998); *McDaniels v. Flick*, 59 F.3d 446, 453 (3d Cir. 1995).

A. Qualified Immunity

Our Supreme Court in *Saucier v. Katz* mandated a two-step analysis concerning qualified immunity: first, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right; and second, whether that right was clearly established. 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202. The Supreme Court held that *Saucier's* "rigid order of battle" is not a mandatory requirement. *Pearson v.*

*Callahan*, 555 U.S. 223, 235, 129 S.Ct. 808, 172 Ed. 2d 565 (2009). Lower courts can use their discretion to decide which of the two prongs to consider first. *Id.* at 818. The right to be secure in one's own home against unreasonable searches and seizures is a clearly established right. *Payton v. New York*, 445 U.S. 573, 586 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980).

Kontz argues that he is immune from liability for four reasons. First, he argues that he acted reasonably; two other police officers testified at trial that they believe he lawfully seized the Shreys' pins. Second, Kontz argues that he acted in accordance with the law based on the direction of First Assistant District Attorney Kenneth Osokow. Third, Kontz argues that he is entitled to the protection of qualified immunity because there were exigent circumstances combined with probable cause to believe that a crime had been committed. Finally, Kontz argues that he is entitled to qualified immunity protection because he had probable cause to believe that a crime had been committed and the pins were in plain view. Of these four arguments advanced in Kontz's brief, the undersigned only charged the jury as to Kontz's second argument (along with the law of consent as discussed in Section II.B. below); the undersigned did not charge the jury as to Kontz's first, third and fourth arguments for the reasons set forth below.

Kontz's four-fold argument can be further broken down into two general

categories. His first two arguments support his assertion that he had probable cause to believe that a crime had been committed. His second two arguments support his assertion that there was a valid exception to the warrant requirement. As discussed in detail below, the Court has determined as a matter of law that Kontz had neither probable cause nor a valid exception to the warrant requirement.

Preliminarily, Kontz argues, relying on *Ashcroft v. al-Kidd,* __ U.S. __, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) that he is entitled to qualified immunity because "every" reasonable official could have believed that his conduct was unlawful and two officers testified at trial that they believed his conduct was lawful. ECF No. 113 at 4. To further bolster this argument, Kontz argues that because Agent Sorage was present, Sorage had a duty to intervene if Kontz was acting unlawfully pursuant to *Smith v. Mensinger*, 293 F.3d 641 (3d Cir. 2002).

Neither of the two cases cited by Kontz, however, stand for the proposition he has suggested. First, *al-Kidd* does not stand for the proposition that a police officer is entitled to qualified immunity because fellow officers testify in support of him at trial. *al-Kidd* does stand for the initial part of Kontz's argument that every reasonable official would have to know that their conduct was unlawful. Be that as it may, the undersigned is not aware of a single judicial opinion that suggests that Kontz may seize a citizen's property without either a warrant or a

valid exception to the warrant requirement.

Every reasonable official understands that the clearly established law is that law enforcement needs a warrant or a valid exception to the warrant requirement (combined with probable cause) in order to seize property. The right to be secure in one's own home against unreasonable searches and seizures is a clearly established right. *Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). "Unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the first clause of the *[Fourth] Amendment*." *Id.* at 585. "It is a "basic principle of *Fourth Amendment* law" that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586. (Internal citations omitted).

Despite Kontz's contention, neither Sorage nor Gregory A. Foresman, Chief of Police, testified at trial that they thought Kontz had an unlimited right to enter the property and seize the pins at will. Moreover, Sorage did not testify as to the legal basis upon which Kontz had to enter or confiscate the Shreys property. ECF No. 117 at 189-218. Sorage merely testified that he did not sit in on the entire call to Osokow; he left the room at some point and he only heard a portion of the call. *Id.* at 195-197. Thus, Sorage did not hear the advice Osokow gave to Kontz. Sorage was then at lunch with Kontz on July 14, 2008, when Kontz asked Sorage

to accompany him to the Shreys' home. *Id.* at 197-198. Sorage did not participate in the decision making process as to whether or not there was a legal basis upon which Kontz had to enter or confiscate the Shreys property. At most, Sorage testified that he believed, based on the information given to him by Kontz, and not having done any independent research into the case, that there was probable cause to believe the sections of the criminal code discussed *infra* had been violated. ECF No. 206-207. What Sorage did not testify to, despite Kontz's assertion to the contrary, was that there was probable cause combined with a valid exception to the warrant requirement to seize the property of the Shreys.

Furthermore, although not relevant to the legal standard at hand, it is important to note that not every officer who testified at trial testified on behalf of Kontz. Randy Shrey testified that the reason he instituted the instant lawsuit was because he received a call from a Williamsport police officer named Jimmy Rogers, who told him that Kontz did not act according to procedure. ECF No. 116 at 100-102. Lieutenant Steven Helm testified that, "in some cases there are areas where I would say [Kontz does not have a stellar reputation for honesty.]" ECF No. 117 at 170. Helm continued by saying, "I mean with me, he doesn't have the greatest reputation for being totally truthful." *Id.* No officers testified as to the Kontz's proposition - that he had an unlimited right to enter the Shrey home and

take personal property without legal justification.

Thus, although Kontz suggests that *every* officer testified on his behalf at trial, the facts do not bear this out. No officer testified that he independently believed that Kontz had legal justification for seizing the Shreys property. Nor did a single officer testify that he would have acted as Kontz did in the same situation. The officers were merely fact witnesses; none were acting as an expert to testify as to the reasonableness of Kontz's actions. Moreover, the court in *al-Kidd* stressed is that the reasonableness inquiry is an objective one. *al-Kidd*, 131 S. Ct. at 2080. "This approach recognizes that the *Fourth Amendment* regulates conduct rather than thoughts; and it promotes evenhanded uniform enforcement of the law" *Id.* (Internal citations omitted).

Before the Court departs from Kontz's broad, unfounded argument that the testimony of his fellow officers supports a finding that police officers acting in concert with one another can act with impunity with regard to the *Fourth Amendment*, so long as they back each other up with testimony at their § 1983 trial, Kontz, almost in the same breath, attempts, for the first time in this litigation, to shift the blame to Agent Sorage. Kontz cites to *Mensinger, supra*, to suggest that Sorage should have stopped Kontz from violating the *Fourth Amendment's* prohibition against warrantless seizures.

That is not the proposition that *Mensinger* stands for.  *Mensinger* only "hold[s] that a corrections officer's failure to intervene in a beating can be the basis of liability for an *Eighth Amendment* [excessive force] violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to." *Mensinger*, 193 F.3d at 651.  Kontz's reliance on *Mensinger* and his attempts to shift the blame to Sorage post-trial is baseless.

Kontz's second argument is that he is entitled to qualified immunity because he reasonably relied on the advice of First Assistant District Attorney Kenneth Osokow, Esquire.  In *Kelly v. Borough of Carlisle*, the United States Court of Appeals for the Third Circuit held that "a police officer who relies in good faith on a prosecutor's legal opinion that the arrest is warranted under the law is presumptively entitled to qualified immunity from *Fourth Amendment* claims premised on a lack of probable cause." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 255-56 (3d Cir. 2010). Although this case had not been decided in 2008, at the time of the events in question, there were indications from other circuits that relying on advice from prosecutors was, at a minimum, part of the analysis as to whether officers should be entitled to qualified immunity. *Cox v. Hainey*, 391 F.3d 25 (1ˢᵗ Cir. 2004).  However, it must have been objectively reasonable to rely on said advice, because "a wave of the prosecutor's wand cannot magically transform

an unreasonable probable cause determination into a reasonable one." *Kelly*, 622

F.3d at 256, *citing Cox* 391 F.3d at 34.

What Kontz overlooks in this argument is that it was clear that he did not, in

fact, rely on Osokow's advice. Kontz testified that he and Agent Sorage

researched the Pennsylvania criminal code and found two statutes that the Shreys

had possibly violated, and that Osokow had found a third. Those statutes are set

forth, as follows:

### Simulating objects of antiquity, rarity, etc.

A person commits a misdemeanor of the first degree, if with **intent** to defraud anyone or with **knowledge** that he is facilitating fraud to be perpetrated by anyone, he makes, alters or utters any object so that it appears to have value because of antiquity, rarity, source, or authorship which it does not possess.

18 Pa. C.S. § 4102 (emphasis added);

### Trademark counterfeiting

(a) Offense defined – Any person who **knowingly** and with **intent** to sell or distribute and with **intent** to sell or to otherwise transfer for purposes of commercial advantage or private financial gain: (1) manufactures; (2) sells; (3) offers for sale; (4) displays: (5) advertises: (6) distributes; or (7) transports any items or services bearing or identified by a counterfeit mark shall be guilty of the crime of trademark counterfeiting...

18 Pa. C.S. §4119 (emphasis added);

### Unauthorized use of registered insignia

A person commits a summary offense if, without authority, such person

13

> **knowingly** wears, exhibits, displays or uses, for any purpose, any insignia registered under Chapter 13 of Title 54 (relating to insignia).

8 Pa.C.S. § 6710.

Osokow is a long-standing assistant district attorney, having served Lycoming County for 37 years. ECF No. 117 at 63. Kontz testified that he called Osokow by telephone to discuss possible criminal violations, although he did not show the trading pins to Osokow. ECF No. 116 at 174. Osokow further testified that he has no independent recollection of the conversation. ECF No. 117 at 64 and 68. Osokow also testified that 18 Pa.C.S. § 4102 would not have applied to the situation at hand because "the statue requires an intent to defraud." *Id.* at 64. Osokow testified that 18 Pa. C.S. § 4119 would only have applied to the situation at hand if either the Little League or Williamsport Police Department's logos were registered. *Id.* at 65. Finally, Osokow testified that 18 Pa.C.S. § 6710 would only apply if the logos were "registered and there was some showing of an intent to defraud." *Id.* at 66.

Thus, Osokow testified that, although he does not remember speaking with Kontz about the statutes and the pins at issue, his advice would have been that if the Shreys knowingly or intentionally were violating the statutes, and, if the logos were registered, then probable cause would exist to believe that a crime had been committed. However, Kontz testified at trial that he did not believe that the

14

Shrey's knowingly or intentionally were violating the statues. ECF No. 116 at 175. Kontz testified that "I indicated that I believed that Mr. Shrey may have done something inadvertently and he may not have realized what it was that he did..." *Id.* Nor did Kontz research whether either logo was, in fact, registered.

The jury understood Osokow's testimony that the statutes have a scienter[3] requirement. So Kontz did not act reasonably in relying on Osokow; in fact, he went against the advice of Osokow in seizing the pins of the Shrey's without probable cause to believe that a crime had been committed.

Moreover, Kontz testified at trial that he himself had produced Little League pins using the Williamsport Police logo and also the Little League logo. ECF No. 116 at 171-172. Kontz told Shrey during the July 14, 2008 encounter that he was a pin collector himself. ECF No. 116 at 89. Kontz also told Shrey that he had made a Little League badge pin himself in the past with the Little League logo. *Id.* and ECF No. 118 at 38. The Court believes that the jury understood how disingenuous it was for Kontz to have suggested that it would have been a crime for Shrey to produce the pins, but that it was not a crime for Kontz to have produced similar pins.

---

[3]Osokow did not use the word "scienter" in his testimony to the jury. The Court uses it here because it is the most effective word to encompass both the knowledge or intent or both that is required by the statutes.

The first two questions on the verdict form dealt with the facts surrounding the reliance on Osokow, because there were disputed facts on this issue.

Question One reads "Do you find, by a preponderance of the evidence that Defendant, Raymond Kontz, III had a conversation with First Assistant District Attorney of Lycoming County, Kenneth Osokow, regarding the legality of Randy and Janete Shrey's property?" ECF. No. 101 at 2. This question was included on the verdict form because, based on the testimony of Osokow, the Court had doubts that the conversation actually occurred. The undersigned would have thought that such a *sui generis* conversation would have remained in Osokow's memory. Consequently, the undersigned wrote the charge for the jury to determine the fact of whether or not they believed, by a preponderance of the evidence, that the conversation with Osokow occurred. However, counsel for Plaintiffs directed the jury in his closing instructions to answer "yes" to this question; the jury responded affirmatively.

The second question of historical fact presented to the jury was "Do you find, by a preponderance of the evidence, that Defendant, Raymond Kontz, III, relied in good faith on the legal opinion of the First Assistant District Attorney of Lycoming County, Kenneth Osokow, prior to the seizure of Randy and Janete Shreys property?" Had the jury answered "yes" to this question, the undersigned

would have determined that, legally, Kontz would have been entitled to qualified immunity based on the jury's determination of a reasonable reliance on a prosecutor's advice; the jury form then would have required the jury to bypass the third question, the § 1983 *Fourth Amendment* violation, and proceed directly to the fourth question regarding the conversion count. However, the jury answered "no" to this question. As discussed previously, there was sufficient evidence for the jury to respond "no" to this question. Osokow testified that the three statutes noted above have either a scienter or registration requirement, or both, and Kontz testified that he did not believe the Shreys had knowingly committed any of the three crimes he had presented to Osokow, nor did he research whether either logo was registered.

Kontz argues his warrantless entry was justified by probable cause along with exigent circumstances. "In the ordinary case, the Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the *Fourth Amendment* unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place,* 462 U.S. 696, 701, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983). "Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has

interpreted the Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *Id.* "[B]ecause, under these circumstance, the risk of the item's disappearance or use for its intended purpose before a warrant may be obtained outweighs the interest in possession." *Id.* at 701-02.

The police cannot create the exigency themselves. *See United States v. MacDonald*, 916 F.2d 7667, 770-771 (2d Cir. 1990). "Any warrantless entry based on exigent circumstances must, of course, be supported by genuine exigency." *Kentucky v. King*, __ U.S. __, 131 S. Ct. 1849, 1862, 179 L. Ed. 2d 865 (2011). Nevertheless, when a package or other container may be seized in order to prevent loss or destruction of evidence, police still need to obtain a warrant before examining its contents. *See United States v. Young* 573 F.3d 711, 720-721 (9th Cir. 2009).

The undersigned did not include an exigent circumstances instruction in the charge because there was no evidence of any exigency based upon the facts elicited from testimony at trial. Kontz testified that had the Shreys not turned the pins over to him, he would have posted Sorage at the door and attempted to obtain a warrant.

Exigent circumstances exist when there is cause to believe that contraband may be removed or destroyed unless law enforcement acts quickly. *Fisher v. Volz*, 496 F.2d 333, 339 (3d Cir. 1974). Kontz did not testify as to any actual exigency, in fact his testimony was the opposite. Prior to even approaching the Shreys and discovering that they were participatory in the encounter, Kontz testified that he "would have left, gone, looked into it more." ECF No. 116 at 176. Kontz testified that he had time to post an officer at the door to obtain a warrant, stating, "[w]ell, then at that point we would have left and we would've had an officer come to the house. We would have posted up the residence to make sure that the Shreys didn't leave with any of the items or anything, until I could have gone and gotten a warrant for his arrest and a search warrant for the house." ECF No. 116 at 177. He testified that "We would have left the residence. I would have called for a marked police car to come there an have an officer stand by at the residence while I went back to City Hall. We would have completed a search warrant and an arrest warrant for Mr. Shrey." ECF No. 118 at 17. Kontz further testified that he would have had an officer stand by at the house "[t]o make sure that the pins weren't removed from the residence, that none were taken, tampered with, destroyed, removed so that we could not get all the pins that were there at the time." *Id.* This belies his argument of exigent circumstances.

Kontz's own testimony is the reason that the undersigned eliminated the exigent circumstance jury instruction from the draft charge that was prepared and presented to counsel for review pre-trial. After the testimony of Kontz at trial, it was clear to the undersigned that there were not exigent circumstances and it was not an appropriate instruction to present to the jury.

Finally, Kontz argues that he is entitled to qualified immunity because the pins were in plain view. As explained to Mr. MacMain during the charge conference, a plain view instruction was not included in the charge because Kontz created the "plain view." This is a consent case, however, not a plain view case. For the plain view doctrine to apply the officers must first, not have violated the *Fourth Amendment* and must lawfully be in a position from which to view the object; second, the object's incriminating character is immediately apparent; and third, the officers have a lawful right of access to the object. *Horton v. California*, 496 U.S. 128, 1135-142, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990). "If an article is **already** in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Id.* at 133 (emphasis added) (internal citations omitted).

Despite the fact that the officers did not have probable cause to believe that a crime had been committed and thus were not lawfully at the Shreys home, and despite the fact that possession of the pins was not actually a crime, the pins were

never in the plain view of Kontz.  The testimony at trial was that Kontz asked to see the pins and Randy Shrey brought the pins to Kontz.  The fact that Kontz asked to see the pins and that the Shreys consented (the voluntariness of that consent is discussed in the next section) makes this a consent case, not a plain view case.

B. Consent

Kontz argues that the Shreys knowingly and voluntarily surrendered the pins to him.  Kontz contends that this is evidenced by the Shreys turning over the pins to Kontz in person on July 14, 2008, then traveling to Williamsport City Hall the next day to turn over more pins that they found in their home.

"In situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).  "Consent can provide an exception to the warrant requirement if it is voluntarily given." *We Buy, Inc. v. Town of Clarkstown*, 2006 U.S. Dist. LEXIS 76792, *20 (S.D. N.Y. Oct. 20 2006) (Sand, J.) *citing Schneckloth, supra.*  Consent must be "freely and voluntarily given. " *Id. citing Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968). "The question of whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or

implied, is a question of fact to be determined by the totality of all the circumstances." *Id.* at *21. "Whether consent is voluntary under all the circumstances is a question of fact....[that] must go to the factfinder." *Id.* at *9.

The jury was charged on the law of consent. ECF No. 100 at 19-20. In reviewing the charge, now more than five months after it was written and given to the jury, the undersigned, respectfully finds no error.

The charge read as follows:

**Count I - Unlawful Seizure of Property pursuant to 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution.**

Randy and Janete Shrey are suing under Section 1983, a civil rights law passed by Congress that provides a remedy to persons who have been deprived of their federal constitutional rights under color of state law.

Randy and Janete Shrey must prove both of the following elements by a preponderance of the evidence:

First: Raymond Kontz, III acted under color of state law.

Second: While acting under color of state law, Raymond Kontz, III deprived Randy and Janete Shrey of a federal constitutional right.

I will now give you more details on action under color of state law, after which I will tell you the elements Randy and Janete Shrey must prove to establish the violation of their federal constitutional right.

Because Raymond Kontz, III was an official of the city of Williamsport Police Department at the relevant time, I instruct you

22

that he was acting under color of state law.  In other words, this element of Randy and Janete Shrey's claim is not in dispute, and you must find that this element has been established.

The second element of Randy and Janete Shrey's claim is that Raymond Kontz, III deprived them of a federal constitutional right.

The federal constitutional right at issue is the Fourth Amendment to the United States Constitution. The Fourth Amendment protects property from being subjected to unreasonable seizures by the police without a warrant. A law enforcement official may seize a person's property without a warrant, but needs appropriate justification to do so.  The Fourth Amendment protects a person's property so that it may only be seized without a warrant when the law enforcement official has consent to seize the property.  Probable cause is not required under the Fourth Amendment if the individual gives the law enforcement officer his or her consent.

Consent must be given freely and voluntarily. In determining voluntariness, you must consider the totality of the circumstances, including the characteristics of the person who is alleged to have consented and the context in which the consent is sought. Consent may not be coerced, by explicit or implicit means, or by implied threat or covert force.  Consent may be valid even if the consenting individual did not know of the right to refuse consent.  Police officers are permitted to persuade individuals to consent, to make the alternative of consenting more attractive than forcing the officers to obtain a search warrant. The law enforcement officer may inform the person of the consequences of refusing to consent. The Defendant, Raymond Kontz, III, has the burden of proving Mr. and Mrs. Shrey's voluntary consent to the seizure of their pins.


Conclusion

Law enforcement officers do not violate the Fourth Amendment if they have consent to seize property.

If you find that Raymond Kontz, III had consent to seize the pins of

Randy and Janete Shrey, then you must find in favor of Raymond Kontz, III on Count I.

However, if you find that Raymond Kontz, III did not have consent to seize the pins of Randy and Janete Shrey, then you must find against Raymond Kontz, III on Count I.

ECF No. 100 at 19-21.

In the motions currently pending before the Court, Kontz asks the Court to state that the jury was wrong. Sufficient evidence was adduced at trial to suggest that the jury may well have a reached the correct determination and that the Shreys' consent was coerced. Two officers, Kontz and Sorage, presented themselves at the Shreys home to discuss the Shreys' pins. Randy Shrey testified that he had never been arrested before. ECF No. 116 at 86 and 96. Kontz arrived in uniform and Sorage had visible a gun and handcuffs. *Id.* at 89. Randy Shrey was sitting down, Kontz was standing over him "point[ing] his finger in [Mr. Shrey's] face." *Id.* at 87. Kontz threatened to charge Shrey with a felony. *Id.* Kontz mislead the Shreys during the encounter and told them that the Williamsport Police Department badge was copyright protected. *Id.* at 90. The encounter was so frightening to Janete Shrey that she started to cry. *Id.* at 87. Mr. Shrey "felt threatened." *Id.* Randy Shrey thought he would be taken to jail that day for "something I don't even think I did wrong." *Id.* Randy Shrey, who had apparently never had any encounters with law enforcement said, "I'm thinking policemen, you

24

trust them.  You know if I did something wrong I'm going to comply.  I'm not going to break the law."  *Id.* at 87-88.  Mr. Shrey went on to say, "I was shaking.  I was in fear.  I had a big bag of [pins] down there.  I just grabbed the bag and took them up and turned them over. [Kontz] said – he was angry.  He was almost ballistic."  *Id.* at 88, *see also* ECF No. 118 at 44.   Mr. Shrey went on to testify that he "absolutely [did] not" want to turn over his pins.  *Id.* at 90.  He only gave the pins to Kontz because he "didn't want to go to jail." *Id.* Janete Shrey's testimony corroborated that of her husband.  ECF No. 117 at 31-61.

The jury also heard a different version of events from the Defendant.  Kontz testified that he only used a conversational tone during the encounter.  ECF No. 117 at 14-15 and ECF No. 118 at 17-18.   Sorage also testified that Kontz used a conversational tone during the encounter.  *Id.* at 199.

When Randy Shrey realized a few hours later that he still had more pins he testified that he gave Kontz the extra pins he found as well saying,  "I thought we're honest people.  I want to turn them over. . . I called ...Kontz ...he came back and got those pins too."  ECF No. 116 at 91.  Then, in addition to that, the next day Mr. Shrey found more pins and went to the police station to turn those pins over. *Id.* at 91-92.

The undersigned is not surprised that the jury found that the consent was not

"freely and voluntarily given." Watching the trial and seeing the evidence first hand, the undersigned can see why the jurors believed the Shreys and did not believe Kontz. The Shreys came across as honest, and, frankly, frightened citizens. By comparison, Kontz came across as someone trying to protect himself rather than someone testifying as to the facts, and only the facts. Suffice it to say that sufficient evidence existed for the jury to made a determination that the consent to seize the pins was not voluntarily given.

C. <u>Weight of the Evidence</u>

Kontz next argues that he is entitled to judgment as a matter of law on the conversion claim.

The undersigned charged the jury as to conversion as follows:

Randy and Janete Shrey also sued Raymond Kontz, III for conversion. Conversion is the deprivation of another's right of property in, or use, or in possession of, that property, without the owner's consent an without lawful justification.

Randy and Janete Shrey must prove all four of the following elements:

1. The pins belonged to Randy and Janete Shrey;
2. Raymond Kontz, III took possession of the pins;
3. Randy and Janete Shrey did not consent to Raymond Kontz, III taking possession of the pins; and
4. Raymond Kontz, III had no legal justification to take the pins.

The parties agree that elements one (1) and two (2) have been proven, so

I instruct you that the pins belonged to Randy and Janete Shrey and Raymond Kontz, III took possession of the pins. In other words, elements one (1) and two (2) of Randy and Janete Shrey's claim are not in dispute, and you must find that these first two elements have been established.

If Randy and Janete Shrey have proven by a preponderance of the evidence all four of these elements, then you must find in favor of Randy and Janete Shrey on Count II.

If Randy and Janete Shrey did not prove by a preponderance of the evidence all four of these elements, then you must find in favor of Raymond Kontz, III on the Count II.

ECF No. 100 at 22-23.

"In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence...The question is...whether there is evidence upon which the jury could properly find a verdict for that party." *Lightning Lube, Inc., supra.* Kontz argues that there is no evidence that he converted the pins to his own use. That was not the question for the jury. The jury was instead asked to determine whether the Shreys consented to Kontz taking the pins and if Kontz had legal justification to take the pins. The Court is also not charged via this Rule 50 motion to re-weigh the evidence. There was sufficient evidence upon which the jury could properly find for the Shreys and against Kontz on the conversion claim; that evidence is discussed in detail above.

**2. Motion for a New Trial**

Fed. R. Civ. P. 59(a) provides that "The court may, on motion, grant a new trial on all or some of the issues...after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." "Under this rule, a court, in the exercise of discretion, may grant a new trial if, *inter alia*, the jury's verdict was against the weight of the evidence, or if substantial errors occurred in the admission or exclusion of evidence or in the charge to the jury." *Kidd v. Commonwealth of Pennsylvania, Bureau of Liquor Control Enforcement*, 2001 U.S. Dist. LEXIS 15856, No. Civ.A. 97- CV-5577, 2001 WL 1159770, at *1 (E.D.Pa. Aug. 21, 2001) (*citing Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 85 L. Ed. 147, 61 S. Ct. 189 (1940)). "Nevertheless, new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record cries out to be overturned or shocks our conscience." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991) (*citing EEOC v. Delaware Dep't of Health* and Soc. Servs., 865 F.2d 1408, 1413 (3d Cir. 1989)). *See also Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993).

"When the basis of the motion involves a matter within the trial court's sound discretion, such as my evidentiary ruling or point of charge to the jury, I have wide latitude in deciding the motion." *McKenna v. City of Philadelphia*,

2008 U.S. Dist. LEXIS, 76766, *9 (E.D. Pa. Sept. 30, 2008) (Ditter, Jr. J.) (Internal citations omitted). "If the verdict is alleged to be against the weight of the evidence, however, my discretion to order a new trial is much narrower, and I shall not substitute my judgment of the facts and the credibility of the witnesses for that of the jury." *Id.* (Internal citations and quotations omitted).

Generally, a court will sustain a jury verdict "if, drawing all reasonable inferences in favor of the prevailing party, there is a reasonable basis to uphold the verdict; courts will examine the record for evidence that could reasonably have led to the jury's verdict." *Kidd*, 2001 U.S. Dist. LEXIS 15856, 2001 WL 1159770, at *1 (citing *Nissim v. McNeil Consumer Products Co.*, 957 F. Supp. 600, 602-04 (E.D.Pa. 1997) (Reed, J.), aff'd, without opinion, 135 F.3d 765 (3d Cir. 1997)). *See also Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989). Indeed, "[a] trial judge must be extremely reluctant to interfere with the time-honored power of the jury, in the exercise of its collective judgment, to assess the damages sustained by the plaintiff." *Wontor v. Neenan*, No. 92-1588, slip op. at 7 (M.D.Pa. June 28, 1996) (Vanaskie, J.). (Internal quotation and citations omitted).

Moreover, the court does not have the prerogative to substitute its own judgment as to the amount of damages for that of the jury. Thus, regardless of

whether the trial judge agrees or disagrees with the jury's verdict, the verdict must be upheld so long as it is supported by a 'minimum quantity of evidence from which a jury might reasonably decide to afford relief.' *Id*. at 7-8 (*quoting New Market Inv. Corp. v. Fireman's Fund Ins. Co.*, 774 F. Supp. 909, 917 (E.D.Pa. 1991)) (Broderick, J.) (further citation omitted).

"A party moving for a new trial on the basis of an improper jury instruction must have made an appropriate and timely objection prior to the start of jury deliberations." *Kidd*, 2001 U.S. Dist. LEXIS 15856, 2001 WL 1159770, at *2 (*citing Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc.*, 74 F.3d 488, 496 (4th Cir. 1996); *Juneau Square Corp. v. First Wis. Nat'l Bank*, 624 F.2d 798, 810 (7th Cir. 1980)).

A. <u>Admission of testimony from Kenneth Osokow, Esquire</u>

Mr. MacMain did object on the record during trial to the testimony of Kenneth Osokow, Esquire. ECF No. 117 at 4-5. Mr. MacMain objected because Osokow did not remember the conversation with Kontz; his testimony was therefore speculative. He also objected to the extent Osokow would testify as an expert. *Id.*

This argument by the defense is once again, somewhat disingenuous, both because the defense relies on Kontz's conversation with Osokow to establish the

qualified immunity defense, and also because, despite our limiting instruction to Plaintiffs' counsel, it was actually defense counsel who questioned Osokow as a legal expert, asking Osokow to define "probable cause" to the jury. ECF No. 117 at 69-70. To that end, Mr. MacMain asked,

> Q: Can you tell the jury, kind of in plain English, what probable cause is?"
>
> A: Based on the information, reliable information there's a basis to conclude that a crime has probably been committed and that a particular individual committed it.
>
> Q: Okay. It's not proof beyond a reasonable doubt?
>
> A: Correct.
>
> Q: It's not certainty, it's a reasonable belief?
>
> A: Correct.

*Id.*

Moreover, although this is certainly not the legal standard by which the admission of this testimony will be judged, it is important, nevertheless, to note that Osokow's testimony bolstered the credibility of Kontz. Osokow testified that Kontz has always been truthful, credible, reliable, trustworthy and a good officer. ECF No. 117 at 71 and 76. Osokow further testified that he would have no reason

to disagree with Kontz's testimony. *Id.* at 71-72.  Plaintiffs' counsel's questions were limited in scope and, therefore, it was not an error to admit the testimony of Osokow.

B. Jury Instructions

Kontz argues that he is entitled to a new trial because, after hearing the testimony, the undersigned declined to instruct the jury on plain view and exigent circumstances.  I will conserve judicial resources and not rehash my prior reasoning, discussed in Section II.1.A. above, other than to note that the trading pins at issue were not in plain view and exigent circumstances did not exist.

3.  Motion for Remittitur

Kontz moved for remittitur asking the Court to eliminate or reduce the punitive damages award. "[I]t is well established that there are procedural and substantive constitutional limitations on [punitive damages] awards."  *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 417; 123 S. Ct. 1513; 155 L. Ed. 2d 585 (2003).  "The Due Process Clause of the *Fourteenth Amendment* prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Id.* (Internal citations omitted).  "The reason is that elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the

severity of the penalty that a State may impose." *Id.* (Internal citations omitted).

"To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.* (Internal citations omitted).

The seminal case lower courts utilize in reviewing the constitutionality of a punitive damages award is *BMW v. Gore*. 517 U.S. 559; 116 S. Ct. 1589; 134 L. Ed. 2d 809 (1996). There is an oft-quoted three-part test from *Gore*, but as an initial matter, prior to the application of that tripartite test, the Supreme Court advised that "the federal excessiveness inquiry appropriately begins with an identification of the state interests that a punitive award is designed to serve." *Id.* at 568.

"The purpose of punitive damages is to punish the Defendant for his willful or malicious conduct and to deter others from similar behavior." *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 306 n.9; 106 S. Ct. 2537; 91 L. Ed. 2d 249 (1986). "A jury may be permitted to assess punitive damages in an action under § 1983 when the Defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56; 103 S. Ct. 1625; 75 L. Ed. 2d 632 (1983). "While the *Smith* Court determined that it was unnecessary to show actual malice to qualify for a punitive award . . . , its intent

standard, at a minimum, required recklessness in its subjective form. The Court referred to a 'subjective consciousness' of a risk of injury or illegality and a '"criminal indifference to civil obligations."'" *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 536; 119 S. Ct. 2118; 144 L. Ed. 2d 494 (1999) (discussing Smith in the context of a Title VII case). The purpose in allowing punitive damages for conversion is the same as in a § 1983 action, to wit: to punish the wrongdoer and to deter similar conduct in the future.

Here, the governmental purpose in allowing punitive damages is to punish Kontz for violating the Shreys' *Fourth Amendment* rights by seizing their Little League pins without lawful justification and also to deter Kontz and other Williamsport Police Officers from violating the constitutional rights of citizens of the City of Williamsport.

Now that the undersigned has determined the governmental interest that a punitive damages award is designed to serve, the Court can turn its attention to whether this "award can fairly be categorized as "grossly excessive" in relation to the aforementioned interests," insomuch that it then enters "the zone of arbitrariness that violates the *Due Process Clause.*" *Gore*, 517 U.S. at 569. The *Gore* Court discussed the three guideposts to help this Court determine whether or not the $45,000 punitive damages award against Kontz is grossly excessive. First,

and most importantly, the degree of reprehensibility of Kontz's conduct; second, the disparity between the harm suffered by the Shreys and the punitive damages award (the ratio between the compensatory and punitive damages award); and finally, the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *See*, *Gore*, 517 U.S. at 574-575. Kontz made only two arguments in his motion for remittitur, based on the first two parts of the *Gore* tripartite test; consequently, this Court will not reach the third element.

First, Kontz argues that there was no egregious conduct by him, and thus the punitive damages award should be reduced or eliminated. "The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. "[E]xemplary damages imposed on a defendant should reflect the enormity of his offense." *Id.* (Internal citations omitted). "[N]onviolent crimes are less serious than crimes marked by violence or the threat of violence...similarly, trickery and deceit are more reprehensible than negligence." *Id.* at 576. (Internal citations omitted). "[P]unitive damages may not be grossly out of proportion to the severity of the offense." *Id.* (Internal citations omitted). "[A] recidivist may be punished more severely than a first offender [because] repeated misconduct is more reprehensible than an individual instance of malfeasance." *Id.* at 577. "The standard for punitive

damages in a federal civil rights action was set by the Supreme Court, and does not require outrageousness: a jury may assess punitive damages in a civil rights action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Alexander v. Riga*, 208 F.3d 419, 430-431 (3d Cir. 2000) (citing *Smith v. Wade*, 461 U.S. 30, 56; 75 L. Ed. 2d 632; 103 S. Ct. 1625 (1983). "[T]he Supreme Court held that the terms 'malice' and 'reckless' ultimately focus on the actor's state of mind, making a showing of egregious or outrageous discrimination unnecessary." *Id.* at 431.

Kontz argued that there is an absence of any egregious conduct by him. Whether or not his conduct was egregious is debatable, but moot. There need not be egregious conduct; to the contrary, the jury need only to have found that Kontz acted with evil motive or intent or was recklessly or callously indifferent to the *Fourth Amendment* rights of the Shreys. Kontz's argument based on the first part of the *Gore* test does not lead this Court to find that the punitive damages award should be remitted.

Second, Kontz argues that the compensatory damages for the conversion claim should be $4,230, and that anything more than 10 times this figure is excessive. Kontz's suggestion is rather odd, as the Court calculates 10 times

$4,230 to be $42,300, an amount that is only $2,700 less than the jury's punitive damages award.

The jury found that the compensatory damages total for both claims is $14,553.09 and awarded as punitive damages $45,000, which is 3.09 times the compensatory damages awarded by the jury. Kontz argues that the compensatory damages and punitive damages should be reduced to a 1:1 ratio, but does not argue what his proposed compensatory damages figure is for the § 1983 claim, the *Fourth Amendment* seizure violation.

"The [] most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580. "The principle that exemplary damages must bear a "reasonable relationship" to compensatory damages has a long pedigree." *Id.* "[A] comparison between the compensatory award and the punitive award is significant." *Id.* at 581. "[T]he proper inquiry is whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred." *Id.* at 582 (emphasis in original) (internal citations omitted). "Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the

punitive award." *Id.* at 582 (emphasis in original) (internal citations omitted). "Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id.* "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that a general concern of reasonableness properly enters into the constitutional calculus." *Id.* at 582-583 (internal citations omitted). "In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both." *Campbell*, 538 U.S. at 426.

The Court heard the evidence presented at trial and does not find the award to be shockingly high. As noted above, the ratio here between compensatory and punitive damages is 3.09 to 1. Therefore, the Court, finds no reason to remit the $45,000 punitive damages award.

## III. CONCLUSION

The jury found this action to be a simple case of a police officer abusing his authority and violating the right of the Plaintiffs to be secure in their own home. The objects at issue were merely trading pins, and in light of the fact that they were not contraband, Kontz did not have a legal basis for seizing them. He had sufficient time to get a warrant, but did not, presumably because he knew that no state magistrate judge in Lycoming County, or any other county in the Commonwealth, would have found that there was probable cause to seize the pins because there was no evidence that a crime had been committed.

It is this Court's view that the jury concluded that Kontz bullied a mild-mannered couple into turning over their trading pins, failed to create an incident report to document the seizure of these items, failed to provide the Shreys with a receipt for these pins and generally behaved in a manner that does not commend himself to approbation by his employer, his fellow officers or the community at large. This is exactly the type of behavior the *Fourth Amendment* is designed to protect.

While this Court will never grasp the motivation behind Kontz's confiscating the Shrey pins without legal justification, it is fair to say that substantial federal judicial and City of Williamsport time and resources have now

been expended over trifling sporting memorabilia.  There is certainly no reason to enter a judgment notwithstanding the jury's verdict nor is there reason to hold a new trial.

Kontz's motion will be denied in its entirety.  An appropriate Order follows.

BY THE COURT:


s/Matthew W. Brann
Matthew W. Brann
United States District Judge